1  MARC EPSTEIN (CSB 61062)
2  JEFFREY B. ELLIS (CSB 81821)
   GAIMS, WEIL, WEST & EPSTEIN, LLP
3  1875 Century Park East, 12th Floor
   Los Angeles, California 90067
4  Telephone:  (310) 407-4551
5  Facsimile: (310) 277-2133

6  *Attorneys for Plaintiffs S&S Development*
7  *Company and Jeffrey Susa*

8                UNITED STATES DISTRICT COURT
9       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
10

11 S&S DEVELOPMENT COMPANY;          Case No. CV 06-7816 CAS (CWx)
   a Nevada Corporation and JEFFREY
12 SUSA, an individual,              **MEMORANDUM OF POINTS AND**
                                     **AUTHORITIES IN OPPOSITION TO**
13                                   **ILLINOIS UNION INSURANCE**
                        Plaintiffs,  **COMPANY'S MOTION FOR**
14                                   **SUMMARY JUDGMENT, OR IN**
                                     **THE ALTERNATIVE, PARTIAL**
15          v.                       **SUMMARY JUDGMENT;**
                                     **REQUEST FOR CONTINUANCE**
16 ILLINOIS UNION INSURANCE          **UNDER FRCP 56(f)**
   COMPANY, an Illinois corporation;
17 and DOES 1 through 50, inclusive,
18                                   Date:      June 9, 2008
                        Defendants.  Time:      10:00 a.m.
19                                   Ctr.:      5
20
21                                   [Honorable Christina A. Snyder]
22
23                                   Trial:     August 19, 2008
                                     Pre-Trial: July 14, 2008
24                                   Mot. Cut:  June 9, 2008
                                     Disc. Cut: December 17, 2007
25
26
27
28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

# TABLE OF CONTENTS

**Pages**

I.   INTRODUCTION ................................................................... 1

II.  BOTH OF ILLINOIS UNION'S ALLEGED GROUNDS
     FOR DENYING ANY DEFENSE ARE BASELESS ................... 4

     A. Relevant Policy Provisions. ................................................ 4

     B. The Underlying Pearson Suit Asserted
        Several Covered Claims Against The
        Plaintiff Insureds ................................................................ 5

     C. The Claim Was Not Made Prior to The
        September 11, 2005 Inception of The Policy. ..................... 8

     D. The Prior And Pending Litigation Exclusion
        Clearly Does Not Bar Plaintiff Insureds'
        Right To A Defense. ........................................................ 10

III. MORE THAN AMPLE TRIABLE FACTS SUPPORT
     THE BAD FAITH CLAIMS ................................................. 12

     A. Illinois Union's Repeated Up To Ten Month Delayed
        Payment Of Defense Counsel Bills, Which
        Continued Even After The Insurer Represented
        Under Penalty Of Perjury That Payment Delays Would
        Not Be "An Issue Any Further," Was Clear Bad Faith ....... 14

     B. Illinois Union's Five Month Delay Before Agreeing To
        Provide A Defense Was Bad Faith. ..................................... 18

     C. Illinois Union's Fraudulent Representation That It
        Actually Paid Other Defense Counsel In The
        Defense Of Similar Actions In Los Angeles County
        Is Further Bad Faith. ........................................................ 19

     D. The Plaintiff Insureds Have Incurred Recoverable
        Damages As A Result Of Illinois Union's Bad Faith. ......... 21

i

IV. MORE THAN AMPLE TRIABLE FACTS SUPPORT
    THE PUNITIVE DAMAGE CLAIMS ........................................................22

V.  CONCLUSION ...........................................................................................24

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

ii

1

# TABLE OF AUTHORITIES

2                                                                           **Pages**

3

**Cases**

4

*Amadeo v. Principal Mut. Life Ins. Co.*
5    290 F.3d 1152 (9th Cir.2002.) ........................................................................ 13

6

*American Medical Security, Inc. v. Executive Risk Specialty Ins. Co.*
7    393 F.Supp.2d 693 (E.D.Wis. 2005)............................................................... 12

8

*Buss v. Superior Court*
9    16 Cal.4th 35 (1997)................................................................................... 3, 19

10

*Delgado v. Heritage Life Ins. Co*
11   157 Cal.App.3d 262 (1984) ............................................................................ 11

12

*Executive Risk Indem. Inc. v. Chartered Benefit Services, Inc.*
13   2005 WL 1838433 (N.D.Ill. 2005) ................................................................... 9

14

*ML Direct, Inc. v. TIG Specialty Ins. Co.*
15   79 Cal.App.4th 137 (2000) ............................................................................. 11

16

*Montrose Chemical Corp. of California v. Superior Court*
17   6 Cal.4th 287 (1993)....................................................................................... 19

18

*Shade Foods, Inc. v. Innovative Product Sales and Marketing, Inc.*
19   78 Cal.App.4th 847 (2000) ............................................................................. 19

20

*St. Paul Reinsurance Co. v. Williams & Montgomery, Ltd.*
21   2001 WL 1242891 (N.D.Ill. 2001) ................................................................... 9

22

*Waters v. United Services Auto. Ass'n*
23   41 Cal.App.4th 1063 (1996) ........................................................................... 22

24

*Wilson v. 21st Century Ins. Co.*
25   42 Cal.4th 713 (2007)..................................................................................... 12

**Statutes**

26

California Civil Code
27   § 2860 ........................................................................................................ 1, 20

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

iii

**Other Authorities**

Croskey, et al., *California Practice Guide, Insurance Litigation*, 2007 ed.
§12:28.7, p.12A-10 .......................................................................................... 12

**Rules**

Federal Rule of Civil Procedure 56(f) ........................................................... 1, 20

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ILLINOIS UNION INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT, ET AL.

1

2

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

# I.
## INTRODUCTION

Plaintiffs S&S Development and its President Jeffrey Susa (collectively "Plaintiff Insureds") contend that Defendant Illinois Union Insurance Company ("Illinois Union") owed them a defense in two underlying actions filed against them by Joyce Pearson in her capacity as Michele Maynard's ("Michele") Trustee of the "Michele Maynard Trust Under the Lynn Simay 1996 Irrevocable Trust." (collectively, the "Pearson Suit")  The Plaintiff Insureds contend that Illinois Union breached its Policy obligations and engaged in multiple acts of bad faith:

1)      Illinois Union unreasonably and in bad faith delayed for five full months before responding to Plaintiff Insureds' demand for a defense, forcing Plaintiff Insureds to pay for the defense themselves.

2)      After this action was filed, Illinois Union finally agreed to provide a defense, but even then Illinois Union unreasonably and in bad faith refused to pay, both retroactively and prospectively, for defense counsel's regular hourly rates that Plaintiff Insureds had agreed to pay five months earlier.  It asserted that California Civil Code §2860(c) ("Section 2860") limited its obligation under the Policy to pay hourly rates that it actually paid to other attorneys that Illinois Union had retained in the ordinary course of the defense of similar actions in Los Angeles County.  That position was both erroneous and in bad faith because Illinois Union knew it had no right to retroactively refuse to fully reimburse Plaintiff Insureds for the cost of their defense without prior notice to them and because Illinois Union knew that its representation that it had previously actually paid for other attorneys retained by it to defend similar actions in Los Angeles was a lie.

3)      Over a period of nearly a year, Illinois Union committed further bad faith by engaging in a conscious and deliberate practice of failing to pay defense counsel's monthly invoices, eventually holding ten months of unpaid invoices.

1

1    Even after Illinois Union's Chief Claims Handler promised in his deposition that

2    no further payment delays would occur, Illinois Union again delayed paying the

3    next monthly invoices submitted for another four months.

4          Illinois Union's motion for summary judgment asserts without justification

5    that Plaintiff Insureds were not entitled to any defense. In making this argument,

6    Illinois Union does not dispute that all of the following requirements for a defense

7    obligation have been met:

8          1)     That the Pearson Suit asserted against the Plaintiff Insureds a

9    "Claim," i.e., a written demand for monetary damages.

10         2)     That the Claim at least in part was based on an alleged "Wrongful

11   Act" by the Plaintiff Insureds in connection with their services as a Commercial

12   Real Estate Broker or Property Manager.

13         3)     That Plaintiff Insureds put Illinois Union on notice of this Claim

14   during the September 11, 2005 through September 11, 2006 Policy period.

15         Illinois Union asserts the following two bases for its assertion that it owes

16   no defense. Its first defense denial ground argues that all coverage is barred

17   because a purported covered Claim, defined as a "demand for monetary damages"

18   based on a "Wrongful Act" committed in connection with Plaintiff Insureds'

19   Commercial Real Estate Broker or Property Manager professional services, was

20   actually first asserted by Pearson prior to the September 11, 2005 Policy inception

21   date. That argument fails for two basic reasons. First, the evidence does not

22   support the assertion that any demand for monetary damages was asserted against

23   the Plaintiff Insureds prior to September 11, 2005.

24         Second, Illinois Union is asserting that a non-covered claim was made

25   against the Plaintiff Insureds, making that purported claim irrelevant to the

26   Policy's coverage. Thus, it could have had no impact on the Plaintiff Insureds'

27   right to coverage for the covered Real Estate Broker and Property Manager

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORINA 90067-2513
TELEPHONE (310) 407-4500

2

1    breach of duty claims, which uncontroverted evidence confirms were first

2    asserted after September 11, 2005 and during the Policy period.  Where an

3    insured is entitled to a defense in an action in which covered and non-covered

4    claims are asserted, the insurer must pay for the entire defense. *Buss v. Superior*

5    *Court*, 16 Cal.4th 35, 59 (1997).  If the covered claim arose before the policy

6    period, the policy's requirement that the claim be made during the policy might

7    apply to reduce or defeat coverage.  But if it is only a non-covered claim that

8    arose before the policy period, no bar to coverage would result because that claim

9    was irrelevant to the risks covered by the policy.

10        Multiple reasons also easily defeat Illinois Union's second defense denial

11    ground – that an exclusion regarding "Prior and Pending Litigation" somehow is

12    triggered by the Pearson Suit's oblique references to a 2000 probate court matter.

13    First, Illinois Union provides no admissible evidence establishing what in fact

14    occurred in the 2000 probate court matter in order to determine how, if at all, it

15    might relate to the Pearson Suit.  Second, Illinois Union's argument ignores that

16    none of the <u>covered</u> claims Pearson asserts against any of the Plaintiff Insureds

17    could possibly have anything whatsoever to do with 2000 probate court matter.

18    Finally, applicable case law does not support the assertion that this exclusion

19    applies to a prior court matter where, as here, none of the alleged misconduct

20    currently at issue was asserted, in dispute, or in any way even remotely addressed.

21        Illinois Union's challenges to the sufficiency of the substantial evidence of

22    its multiple episodes of bad faith delay are equally baseless.  This evidence is

23    more than enough to establish the type of "conscious and deliberate" claims

24    handling misconduct that not only supports bad faith damages, but also punitive

25    damages.

26

27

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

3

## II.
## BOTH OF ILLINOIS UNION'S ALLEGED GROUNDS
## FOR DENYING ANY DEFENSE ARE BASELESS

### A.    Relevant Policy Provisions.

Since 1988, Plaintiff Insureds S&S and its President Jeff Susa have operated a commercial property management and real estate broker business. (Declaration of Jeffrey Susa in Opposition to Illinois Union's Motion for Summary Judgment ("Susa Dec."), ¶ 2.)  On or about September 11, 2005, Illinois Union issued to the Plaintiff Insureds Business and Management Indemnity Policy No. BMI 20024300, with a policy period of September 11, 2005 through September 11, 2006 ("Policy").  (Policy, attached as Exhibit A to Exhibit C of Illinois Union's May 6, 2008 Request for Judicial Notice ("RJN").)

The Policy covers the Plaintiff Insureds solely for claims in the form of a "written demand for monetary damages" that were first asserted during the September 11, 2005 through September 11, 2006 Policy period that arise from an alleged "Wrongful Act." (Policy, Insuring Clause A and Definition B.1, Exhibit A to RJN Exhibit C.)  "Wrongful Act" is defined as "any actual or alleged error, misstatement, misleading statement, omission or neglect or breach of duty by any Insureds, which occurs solely in connection with the Insureds rendering of, or actual or alleged failure to render, Professional Services." (Policy, Definition B.9, Exhibit A to RJN Exhibit C.)  "Professional Services" is defined as "providing professional services as a Commercial Real Estate Agent/Broker and Commercial Property manager for others for a fee." (Policy, Endorsement 2, Exhibit A to RJN Exhibit C.)

These Policy provisions mean that the Policy only covers claims based on an alleged Wrongful Act performed in connection with the Insureds Commercial Real Estate Broker or Property Manager services.  They also mean that any claim asserted against the Plaintiff Insureds Susa that does not involve alleged errors in

4

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1  connection with Commercial Real Estate Broker or Commercial Property

2  Manager services is irrelevant to, and falls entirely outside of, any coverage under

3  the Policy.

4

5  **B.      The Underlying Pearson Suit Asserted Several Covered Claims**
           **Against the Plaintiff Insureds.**

6

7  The operative underlying pleading in this matter, the first amended

8  complaint in the Pearson California Suit ("FAC") (RJN, Exhibit C), asserts an

9  amalgamation of literally dozens of separate and distinct damage claims arising

10 from circumstances occurring at various times between the late 1990's up to early

11 2006.  Although some of the claims are related to each other, many of the claims

12 bear no relationship to each other at all.

13 Plaintiff Insureds are merely two of the seven defendants named in the

14 FAC.  Many of the asserted claims have nothing to do with Plaintiff Insureds and

15 are directed instead solely against one or more of the other defendants.

16 Obviously, Plaintiff Insureds have never requested coverage for those claims.

17 The Plaintiff Insureds also have never requested coverage for those

18 separate distinct claims in the Pearson Suit asserted against Susa that solely

19 involve his conduct in a personal, non-S&S business, capacity.  Those personal

20 claims include the assertions at Paragraphs 34-36 of the FAC that Susa actions as

21 Michele's trustee damaged Michele's Trust.  (RJN, Exhibit C.)  Since, as

22 explained above, the Policy only provides coverage to the Plaintiff Insureds for

23 acts, errors or omissions committed in the conduct of S&S's commercial property

24 management and real estate broker business, the Plaintiff Insureds never had any

25 reason to believe that Pearson's assertions about Susa's alleged misconduct as

26 Michele's Trustee could somehow invoke or be relevant to his Illinois Union

27 coverage for Wrongful Acts committed in the course of S&S's commercial

28 property management or real estate broker activities.  Thus, the Plaintiff Insureds

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

5

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1 have never requested from Illinois Union coverage for these personal trustee

2 claims either.

3      The Pearson Suit, however, also asserts several claims against Susa and

4 S&S that do involve alleged acts, errors or omissions committed by the Plaintiff

5 Insureds in connection with their performance of commercial property

6 management or real estate broker services – a covered activity that gives rise to a

7 duty to defend.  Two such covered claim are Pearson's assertion that Michele's

8 Trust's alleged ownership interest in the Glendora Shopping Center and the

9 Bristol Place Shopping Center was damaged in the respective amounts of

10 $185,000 and $419,000 by Susa's and S&S employee Marilee Tully's ("Tully")

11 involvement in the early 2006 sales and the subsequent distribution of sale

12 proceeds to the two properties' respective owner groups.  (FAC, ¶¶ 44 and 49,

13 RJN, Exhibit C.)

14      Pearson alleged that S&S employee Tully improperly withheld these funds

15 from Michele's Trust in the course of accounting for and distributing to each

16 individual owner that person's respective share of the sales proceeds.  (*Id.*  See

17 also Susa Dec., ¶¶ 13-14, confirming that after Marc Simay's March 2005 death,

18 S&S employee Tully performed property management bookkeeping services,

19 which would include the task of calculating and sending out sales proceed

20 distributions to the owners of the Bristol and Glendora properties.)  The FAC

21 asserted Susa's alleged co-responsibility for this alleged sales proceed shortfall

22 based at least in part on his role as the real estate broker of record for the Simay

23 Company's California commercial properties, which included Bristol and

24 Glendora.  (FAC, ¶3, RJN, Exhibit C.  See also Susa Dec., ¶13, confirming that

25 he assumed this broker of record role after Marc Simay's March 2005 death.)

26      Although the Plaintiff Insureds continue to deny that they committed any

27 error in connection with their involvement with the Glendora and Bristol sales,

28

6

1    one thing that is clear is that Pearson's allegations against them sought monetary

2    damages based on alleged "Wrongful Acts" in connection with the Plaintiff

3    Insureds' performance of Commercial Property Manager and Real Estate Broker

4    services. That met all of the elements of a covered claim, triggering Illinois

5    Union's duty to defend when it received Plaintiff Insureds' June 16, 2006 tender

6    letter (Elstein Dec., Exhibit 1) specifically advising Illinois Union of the covered

7    allegations in ¶¶ 44 and 49 of the FAC.

8         The Plaintiff Insureds informed Illinois Union of another separate and

9    distinct covered claim in a letter to Illinois Union's counsel dated

10   November 3, 2006. (Concurrently filed Declaration of Jeffrey B. Ellis in

11   Opposition to Illinois Union's Motion for Summary Judgment ("Ellis Dec."),

12   Exhibit A.) That letter stated that Pearson's counsel had asserted that S&S, in its

13   capacity as the property manager for the Desert Inn-Jones commercial property in

14   Las Vegas, in which Michele held a partial ownership interest, damaged Michele

15   by allegedly paying excess maintenance fees over the last four years. In her

16   April 24, 2007 responses to interrogatories, Pearson made the same property

17   management breach of duty claim, along with the further claim that property

18   manager S&S wrongfully failed to collect adequate rents for Sahara Town

19   Square, another Las Vegas commercial property partially owned by Michele.

20   (See May 18, 2007 letter to Illinois Union's counsel along with attached

21   interrogatory questions and responses. Ellis Dec., Exhibit B.)

22        Illinois Union's motion does not and cannot contest the existence of these

23   four covered claims asserted by Pearson regarding the Plaintiff Insureds' property

24   management of the Glendora, Bristol, Desert Inn-Jones and Sahara Town Square

25   properties.

26

27

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

7

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.     The Claim was Not Made Prior to the September 11, 2005 Inception of the Policy.**

Illinois Union contends that no defense is owed because <u>prior</u> to the September 11, 2005 inception date of the Policy, the Plaintiff Insureds allegedly received a written demand from Pearson for monetary damages which otherwise would have fallen with the "Wrongful Act" in the performance of "Professional Services" coverage of the Policy, thereby violating the requirement that the Claim be made against the Plaintiff Insureds during the September 11, 2005 through September 11, 2006 Policy period. In fact, substantial evidence proves otherwise.

The Pearson deposition testimony and letters that Illinois Union's Points and Authorities (at page 15) relies on to assert that Pearson demanded "money damages" before September 11, 2005, actually contain no such demand at all. It is a sham argument.

The only "demands" in this evidence that even remotely relate to a request for something of monetary value are the requests that title to Michele's Gladehollow residence be transferred back to Michele's Trust without any liens. None of those requests, however, were made against any of the Plaintiff Insureds. They were made <u>solely</u> against the Estate of Marc Simay, as one would expect since it was that entity, not Susa, that held title to the Gladehollow residence. (Susa Dec., ¶¶ 8-9.) At no time during any pre-September 11, 2005 communications with Pearson did Pearson ever assert to any of the Plaintiff Insureds that she was requesting any money damages from them. (Susa Dec., ¶¶ 8-10.)

The Pearson deposition testimony and letters presented by Illinois Union directly support the Plaintiff Insureds on this point. They confirm that Pearson did <u>not</u> tell Susa that his role in the Gladehollow transfer was "improper." (Elstein Dec., Exhibit 15, 40:14-16.) Pearson's May 19, 2005 letter to Susa

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1    regarding the process of transferring Michele trustee duties and trust accounting

2    records from Susa to Pearson, expresses appreciation for the work Susa had done

3    as trustee and certainly does not assert any demand for monetary damages.

4    (Elstein Dec., Exhibit 16.)

5           Illinois Union's assertion that two reported decisions supposedly support

6    the proposition that a mere request for accounting information constitutes a

7    "demand for monetary damages" that meets a policy's definition of a claim is

8    equally disingenuous. *Executive Risk Indem. Inc. v. Chartered Benefit Services,*

9    *Inc.,* 2005 WL 1838433 (N.D.Ill. 2005) and *St. Paul Reinsurance Co. v. Williams*

10   *& Montgomery, Ltd.*, 2001 WL 1242891 (N.D.Ill. 2001) both hold that an actual

11   demand for money is required to meet this test.  A mere request for accounting

12   records by itself is not a "demand for monetary damages," nor would it make

13   sense for that to be the rule.

14          There is a separate fundamental reason why the argument that an alleged

15   pre-policy period claim regarding Susa's trustee activity must fail.  Namely, it

16   makes no difference to the Insured Plaintiffs' request for coverage whether before

17   the Policy period Pearson allegedly demanded money from Susa because of his

18   actions as Michele's trustee.  As explained above, the Plaintiff Insureds have

19   never requested coverage for Susa's strictly personal service as Michele's trustee,

20   nor could they ever do so.  Such activity is irrelevant to the Policy's coverage

21   since it clearly falls outside of the basic coverage requirement that the claim must

22   be for a "Wrongful Act" arising from the Plaintiff Insureds' Commercial Real

23   Estate Broker or Property Management Professional Services.  Thus, the alleged

24   pre-September 11, 2005 assertion of a claim regarding Susa's trustee activities

25   (which the evidence shows actually did not occur) has no impact on the Insured

26   Plaintiffs' right to receive coverage for the claims of Commercial Real Estate

27   Broker and Property Manager Wrongful Acts that the uncontroverted evidence

28

1  shows were first made <u>after</u> September 11, 2005 and during the September 11,

2  2005 through September 11, 2006 Policy period.

D.  **The Prior and Pending Litigation Exclusion Clearly Does not Bar Plaintiff Insureds' Right to a Defense.**

Illinois Union contends that no defense is owed because each and every claim for damages asserted in the Pearson Suit is supposedly based on alleged Wrongful Acts by Plaintiff Insureds that somehow are sufficiently connected to a probate court matter in 2000 regarding the estate of Lynn Simay ("2000 Lynn Simay Probate") to trigger a total denial of coverage based on the Policy's "Prior and Pending Litigation Exclusion." This exclusion excludes Loss on account of a claim "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any prior or pending litigation or administrative or regulatory proceeding." (Policy, Exclusion 10, Exhibit A to RJN Exhibit B.) This argument is baseless for multiple reasons.

First, Illinois Union has presented no filed documents or other admissible evidence to establish what in fact occurred in the 2000 Lynn Simay Probate. Illinois Union relies solely on a docket sheet from the 2000 Lynn Simay Probate, but the names of the documents listed on the docket sheet cannot prove their contents.

Second, Illinois Union's argument ignores that none of the <u>covered</u> claims Pearson asserts against any of the Plaintiff Insureds, such as the above-described two claims that within the last five years the Plaintiff Insureds have mismanaged the Sahara Town Square and Desert Inn-Jones properties by overpaying vendor maintenance fees and under-collecting tenant rents, have anything whatsoever to do with the 2000 Lynne Simay Probate. Using the words of this exclusion, these property mismanagement claims most definitely are not claims "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in

10

1    consequence of, or in any way involving any prior or pending litigation or

2    administrative or regulatory proceeding." These completely non-related claims

3    cannot be excluded by this exclusion.

4        Finally, the Prior and Pending Litigation Exclusion argument further fails

5    because applicable case law does not support its assertion that this exclusion

6    applies to a prior court action where, as here, none of the alleged misconduct that

7    is the subject of the current action was in any way at issue or even remotely

8    addressed in the prior court action.

9        Reasonably construed, the obvious intent behind this exclusion is to

10   prevent an insured from obtaining insurance after the same allegations of

11   misconduct were first asserted and at issue in some other legal preceding in

12   existence prior to the policy's continuity date. It makes no sense that merely

13   proving that the Pearson Suit mentions an uncontested prior probate matter

14   wherein one of the parties factually involved in the present action – the now

15   deceased Marc Simay – appeared, without providing any proof that any of the

16   alleged wrongful conduct asserted in the Pearson Suit was in any way at issue in

17   the prior probate matter, would trigger the exclusion.

18       Applying the exclusion to our case would also run afoul of a fundamental

19   principles of insurance policy interpretation: that ambiguities in exclusions should

20   be "strictly construed against the insurer and liberally interpreted in favor of the

21   insured." *Delgado v. Heritage Life Ins. Co.*, 157 Cal.App.3d 262, 271 (1984).

22       Not surprisingly, all reported decisions that have construed similar "prior

23   and pending litigation" exclusions have only applied them to deny coverage

24   where the prior litigation matter raised at least some of the same allegations of

25   wrongful conduct that were later asserted in the claim for which coverage was

26   sought. That includes the inapposite case on which Illinois Union attempts to

27   rely, *ML Direct, Inc. v. TIG Specialty Ins. Co.*, 79 Cal.App.4th 137 (2000). In

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

11

contrast, courts have expressly rejected an attempt to apply this exclusion where the insurer could not show that "the facts, circumstances, situations, transactions, events or wrongful acts involved in the [present] claim [were] the <u>same as those underlying or alleged</u> in the prior proceeding." *See, e.g., American Medical Security, Inc. v. Executive Risk Specialty Ins. Co.*, 393 F.Supp.2d 693, 702 (E.D.Wis. 2005) (Emphasis added.)  (Rejecting insurer's attempt to apply exclusion based on prior action that did not assert at least some of the same substantive allegations asserted in the later action.)

## III.
## MORE THAN AMPLE TRIABLE FACTS SUPPORT THE BAD FAITH CLAIMS

Illinois Union's assertion that there is insufficient evidence of bad faith as a matter of law is clearly wrong.  Insurance bad faith is established with proof that the insurer's conduct:

> "[1] demonstrates a failure or refusal to discharge contractual responsibilities,
>
> [2] prompted not by an honest mistake, bad judgment or negligence, but rather by a conscious and deliberate act,
>
> [3] which unfairly frustrates the agreed common purposes [of the insurance contract] and
>
> [4] disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. [citations omitted]"

Croskey, et al., *California Practice Guide, Insurance Litigation*, 2007 ed., §12:28.7, p.12A-10.

In *Wilson v. 21st Century Ins. Co.,* 42 Cal.4th 713, 754-755 (2007), the California Supreme Court summarized the elements of insurance bad faith as follows:

> "An insurer's denial of or <u>delay in paying benefits</u> gives rise to tort [bad faith] damages only if the insured shows the denial or delay was <u>unreasonable</u>.  [Citation omitted.]  As a close

12

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1  corollary of that principle, it has been said that 'an insurer
2  denying or delaying the payment of policy benefits due to the
3  existence of a genuine dispute with its insured as to the
   existence of coverage liability or the amount of the insured's
4  coverage claim is not liable in bad faith even though it might
   be liable for breach of contract.' [Citation omitted.] . . . The
5  genuine dispute rule does not relieve an insurer from its
6  obligation to thoroughly and fairly investigate, process, and
   evaluate the insured's claim.  A genuine dispute exists only
7  when the insurer's position is maintained in good faith and on
8  reasonable grounds.  Nor does the rule alter the standards for
   deciding and reviewing motions for summary judgment.  'The
9  genuine issue rule in the context of bad faith claims allows a
10 [trial] court to grant summary judgment when it is undisputed
   or indisputable that the basis for the insurer's denial of
11 benefits was reasonable – for example, where even under the
12 plaintiff's version of the facts there is a genuine issue as to the
   insurer's liability under California law. . . . On the other hand,
13 an insurer is not entitled to judgment as a matter of law,
14 where, viewing the facts in the light most favorable to the
   plaintiff, a jury could conclude that the insurer acted
15 unreasonably." *Amadeo v. Principal Mut. Life Ins. Co.*,
16 290 F.3d 1152, 1161-1162 (9th Cir.2002.)  Thus, an insurer is
   entitled to summary judgment based on a genuine dispute over
17 the coverage or the value of the insured's claim only where the
18 summary judgment record demonstrates the absence of triable
   issues (citation omitted) as to whether the disputed position
19 upon which the insurer denied the claim was reached
20 reasonably and in good faith."

21     In *Wilson*, the Court held that the trial court erred in granting summary
22 judgment for the insurer on a bad faith claim where the evidence suggested that
23 the insurer's failure to take into account the opinions of the insured's treating
24 physician was "prompted not by an honest mistake, bad judgment or negligence,
25 but rather by a conscious and deliberate act, which unfairly frustrates the agreed
26 common purposes and disappoints the reasonable expectations of the other party
27 thereby depriving that party of the benefits of the agreement." *Id.,* at 726.  In the
28 present matter, there is more than sufficient evidentiary support to create triable

13

1    fact issues in support of at least one, if not several, episodes of insurance bad faith

2    committed by Illinois Union in the handling of the Pearson claim.

3
4       A.      **Illinois Union's Repeated up to Ten Month Delayed Payment of**
                **Defense Counsel Bills, Which Continued Even After the Insurer**
5               **Represented Under Penalty of Perjury that Payment Delays**
6               **would not be "an Issue Any Further," was Clear Bad Faith.**

7
8            One obvious example of Illinois Union's bad faith is its repeated failures to

9    pay defense counsel's monthly invoices in anything even remotely resembling a

10   timely fashion.  Illinois Union's repeated failures over a nearly one year period to

11   make timely payment of defense cost invoices, notwithstanding the insurer's

12   receipt of letter after letter demanding payment, could only have been a conscious

13   and deliberate act which "unfairly frustrated the agreed common purposes and

14   disappointed the reasonable expectations of the [insureds] thereby depriving that

15   party of the benefits of the agreement."

16           In its letter dated November 16, 2006, Illinois Union finally agreed that it

17   would start making payments for defense services provided by the Insureds'

18   defense counsel both prospectively as well as with regard to the five months of

19   defense services provided prior to November 16, 2006.  (Elstein Dec., Exhibit 6.)

20   On December 1, 2006, the Plaintiff Insureds' defense counsel presented

21   Illinois Union with the prior five months of monthly defense service invoices and

22   began to submit for payment monthly future defense service invoices as they

23   were generated.  (Elstein Dec. Exhibit 7.)

24           Thereafter, Illinois Union repeatedly breached its coverage obligation to

25   make payments for defense counsel's monthly invoices in a reasonably prompt

26   fashion.  Letter after letter to Illinois Union demanding payment for these long

27   past due invoices were totally disregarded.  See, letters dated June 15, 2007,

28   July 18, 2007, September 6, 2007 and September 27, 2007.  (Ellis Dec.,

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

14

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1   Exhibits C, D, E and F.)  As of November 1, 2007, nearly one year after Illinois

2   Union made its promise to pay for the Plaintiff Insureds' ongoing defense, the

3   <u>only</u> monthly defense statements for which any payments had been made were

4   the statements covering services rendered from June 2006 through October 2006.

5   As of November 1, 2007, Illinois Union had in its possession, but had failed to

6   make any payments for, ten months of defense counsel services.

7        Illinois Union's response to three monthly invoices covering services

8   rendered from November 1, 2006 through January 31, 2007 demonstrates further

9   how Illinois Union deliberately ignored its obligation to make timely payments.

10  Illinois Union's counsel's April 2, 2007 letter expressly assured the Insureds that

11  a specific payment amount – $13,766.33 – had been authorized regarding those

12  three monthly invoices and that payment would be "immediately" made.  (Elstein

13  Dec., Exhibit 10.)  However, as of November 1, 2007, <u>seven months later</u>, Illinois

14  Union still failed to make even that promised payment.  Illinois Union continued

15  to ignore its written promise to make that specific payment even after it received

16  the Plaintiff Insureds' September 6, 2007 letter that specifically urged Illinois

17  Union to comply with its April 2, 2007 payment promise.  (Ellis Dec., ¶ 6,

18  Exhibit E.)  There can be no doubt that Illinois Union simply decided not to honor

19  its obligations.

20       On November 2, 2007, counsel for Plaintiff Insureds traveled to New York

21  to take the deposition of the Illinois Union Chief Claims Handler in charge of

22  processing and authorizing payment for defense counsel invoices, George Glavas.

23  Glavas' testimony contradicts Illinois Union's assertion that the repeated payment

24  delays were just a "mistake," which should not be deemed bad faith.  Glavas

25  admitted that he was aware of the Plaintiff Insureds' ever-growing number of

26  unpaid invoices, and he admitted that he did not pay them because he chose to

27  give other matters a higher priority.

28

15

1   Glavas stated:

2       "I apologize in the delay.  It did happen.  I wish it didn't. In an
3       ideal world I wanted them to be much sooner, but at the same
        time this is only one case. I have a few other cases that also
4       kept me busy. I prioritize, unfortunately, this one was not at
        the top of my list."  (November 2, 2007 Deposition of George
5       Glavas ("Glavas Dep."), 228:9-17, attached to Ellis Dec. as
6       Exhibit G.)

7       Glavas also admitted that the reason he did not pay the invoices was

8   because Plaintiff Insureds' defense counsel had not threatened to withdraw from

9   representation if payment was not promptly made:

10      "I tried to get bills paid as soon as possible.  [But] I didn't
        have anything, you know, like I said, an alarm saying to me,
11      hey, we need to get paid immediately or we're pulling from
        the case.  From my understanding, your firm has been
12      handling, you know, the insured's litigation, not just this one,
13      but other things, I didn't see anything that required me
        immediately to stop the presses, let's get them caught up with
14      every dollar.  I apologize if I delayed it." (emphasis added)
15      (Glavas Dep., 224:25-225-13, Ellis Dec., Exhibit G.)

16      In short, Illinois Union consciously set up a defense counsel payment

17  system that forced the Plaintiff Insureds to be on the brink of losing their defense

18  counsel due to nonpayment before Illinois Union was willing to pay the bills.

19  Obviously, such practice is far from consistent with the Plaintiff Insureds'

20  "reasonable expectations" regarding the benefits of their insurance policy.

21      Shortly after Glavas' deposition, Illinois Union paid most but still not all of

22  Plaintiff Insureds' past due invoices covering services rendered through

23  August 31, 2007.  But then, Illinois Union's bad faith payment delays resumed

24  even after the taking of the Glavas deposition.  In his deposition, Glavas promised

25  that "going forward I don't see [payment delays] being an issue any further."

26  (Glavas Dep., 226:21-23, Ellis Dec., Exhibit G.)  He further promised that "in the

27

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

16

1  future I don't intend [payment delays] to be an issue" (Glavas Dep., 228:23-24,
2  Ellis Dec., Exhibit G.)

3       Remarkably, in response to the very next monthly invoice, Illinois Union
4  yet again unreasonably delayed payment. Invoices covering defense counsel
5  services rendered from October 1, 2007 through November 30, 2007 were
6  presented to Illinois Union on December 17, 2007. (Ellis Dec., Exhibit H.)
7  When payment was not promptly received, Plaintiff Insureds sent a February 5,
8  2008 letter specifically reminding Illinois Union management of the fact that yet
9  another unreasonable payment delay had occurred. (Ellis Dec., Exhibit I.) In
10 sheer defiance of Glavas' sworn promise to make prompt payment, it was not
11 until April 21, 2008 that partial payment of the December 17, 2007 submitted
12 statements was finally received, a period of more than four months. (Ellis Dec.,
13 ¶ 9.)

14      All of these delays in payment of the Insured Plaintiffs' invoices have
15 occurred while this bad faith action against Illinois Union has been pending in
16 this Court. One would think that an insurer, knowing that its conduct will be
17 evaluated by a finder of fact, would stay on the straight and narrow. One thing is
18 certain, Glavas knew the bills were due, he knew he was not paying them, and
19 thus Illinois Union's nonpayment was a conscious and deliberate act, not a mere
20 mistake.

21      Expert testimony demonstrating the bad faith nature of Illinois Union's
22 repeated payment delays probably is not needed to prove bad faith, but it supplies
23 additional basis for denial of Illinois Union's motion. The enclosed Expert
24 Witness Declaration of David B. Parker confirms, at Paragraph 15, that the
25 reasonable period of time for an insurer to process defense counsel invoices is
26 approximately 30 days and that the payment delays here were "unreasonable and
27 unjustified." (Parker Declaration, attached to Ellis Dec. as Exhibit K.)

28

17

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

**B.** **Illinois Union's Five Month Delay Before Agreeing to Provide a Defense was Bad Faith.**

The evidence shows that during the first two full months following Plaintiff Insureds' June 16, 2006 initial request for a defense, Illinois Union did practically nothing to arrive at a response to the defense request and repeatedly ignored Plaintiff Insureds' multiple increasingly more urgent requests that the insurer provide its coverage decision. (See, Plaintiff Insureds' letters to Illinois Union dated July 19, 2006 (Elstein Supp. Dec., Exhibit 19), August 2, 2006, (Ellis Dec., Exhibit M) and August 15, 2006 (Elstein Supp. Dec., Exhibit 20).

After this two-month delay, Illinois Union belatedly involved outside coverage counsel and more delays ensued. Finally, in early October 2006, Glavas finally reached the decision to provide a defense. (Glavas Dep., 180:16-182:15, Ellis Dec., Exhibit G.) At around the same time, on October 2, 2006, Illinois Union's counsel sent an email which promised that the insurer would provide its defense decision by the "end of "next week," meaning October 13, 2006. (Ellis Dec., Exhibit J.) But Illinois Union did not provide its defense decision by October 13, as promised. And when Illinois Union was confronted with its failure to fulfill that commitment, rather than acknowledge the omission, it responded with a November 6, 2006 letter which claimed it was summarizing the history of the parties' communications about coverage, but conspicuously omitted any reference to its unfulfilled promise to provide a defense decision by October 13, 2006. (Elstein Dec., Exhibit 5)

After Glavas reached the decision, in early October 2006, to provide a defense, Illinois Union delayed another 30 to 40 days, until November 16, 2006, before it finally decided to inform Plaintiffs Insureds about this critically important subject. (Glavas Dep., 180:16-182:15, Ellis Dec., Exhibit G.)

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

18

1    The Parker Expert Witness Declaration further explains why the five month
2    delay was bad faith.  Among other things, it states that the five month delay was
3    "extreme and unjustified."  (Parker Declaration, ¶¶ 7-8, Ellis Dec., Exhibit K.)
4        The critical importance of an insurer arriving at a duty to defend decision
5    as quickly as possible is a well-established principle:

> "If the insurer is obligated to take up the defense of its insured,
> it must do so as soon as possible, both to protect the interests
> of the insured and to limit its own exposure to
> loss . . . [citation omitted].  It follows that a belated offer to
> pay the cost of defense may mitigate damages but will not
> cure the initial breach of duty."  *Shade Foods, Inc. v.*
> *Innovative Product Sales and Marketing, Inc.*, 78 Cal.App.4th
> 847, 881 (2000).

Accord, *Montrose Chemical Corp. of California v. Superior Court*, 6 Cal.4th 287,
295 (1993), holding that: "Imposition of an immediate duty to defend is necessary
to afford the insured what it is entitled to: the full protection of a defense on its
behalf."  See also, *Buss v. Superior Court*, 16 Cal.4th 35, 59 (1997) ("to defend
meaningfully [the insurer] must defend immediately.")

The evidence is more than enough to establish that, at the very latest,
Illinois Union had an obligation to notify the Plaintiff Insureds that it would pay
for a defense by no later than early October, 2006, when Chief Claims Handler
Glavas admits he had reached the decision that a defense needed to be provided.
Illinois Union's decision to delay for yet another month after reaching its early
October 2006 decision to defend is another clear act of a deliberate bad faith act.

**C.    Illinois Union's Fraudulent Representation that it Actually Paid**
**Other Defense Counsel in the Defense of Similar Actions in Los**
**Angeles County is Further Bad Faith.**

Illinois Union also committed bad faith by misrepresenting to Plaintiff
Insureds that there was a factual basis for Illinois Union's assertion that its

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

1   obligation to pay for the defense was limited to $225 per hour, relying on

2   Civil Code §2860.

3     Section 2860 provides, "The insurer's obligation to pay fees to the

4   independent counsel selected by the insured is limited to the rates which are

5   actually paid by the insurer to attorneys retained by it in the ordinary course of

6   business in the defense of similar actions in the community where the claim arose

7   or is being defended." (emphasis added.)  Illinois Union's reservation of rights

8   letter, dated November 16, 2006, represented that Illinois Union actually paid

9   $225 to attorneys retained by it in the ordinary course of business in the defense

10  of similar actions in the community where the claim arose or is being defended.

11  (Elstein Dec., Exhibit 6.)

12    Illinois Union's representation was false, in that Illinois Union never

13  retained and has never actually paid any attorneys to defend a similar action in the

14  community where the underlying claim arose or is being defended.  To avoid

15  duplicative argument, Plaintiff Insureds refer the Court to the Opposition to

16  Motion to Compel Arbitration filed concurrently with this brief, and the

17  accompanying Supplemental Declaration of Jeffrey B. Ellis.

18    **Request for Continuance (FRCP 56(f))**

19    To develop more facts related to Illinois Union's misrepresentation in its

20  reservation of rights letter, Plaintiff Insureds also request that this Court grant

21  relief under FRCP 56(f), to enable Plaintiff Insureds to file additional affidavits to

22  assert facts or evidentiary preclusion orders that may result from Magistrate Judge

23  Woehrle's ruling on a motion for sanctions now under submission.  Plaintiffs first

24  filed a motion to compel Illinois Union to produce the case files upon which it

25  relied in its reservation of rights letter dated November 16, 2006, to make the

26  representation to Plaintiffs that Illinois Union actually paid $225 to attorneys

27  retained by it in the ordinary course of business in the defense of similar actions

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

20

1  in the community where the claim arose or is being defended.  Illinois Union

2  opposed the motion claiming that to comply would be burdensome and time-

3  consuming, but obviously Illinois Union had to know what files it was relying on

4  when it represented to Plaintiffs the hourly rates it actually paid to attorneys

5  defending similar actions in the community.

6          On November 27, 2007, Magistrate Judge Woehrle issued an Order

7  requiring Illinois Union to produce its case files by December 7, 2007.  Illinois

8  Union violated Magistrate Judge Woehrle's Order and produced no files by

9  December 7, 2007.

10         A week later, Plaintiffs filed a Motion for Sanctions for Not Obeying a

11 Discovery Order.  Thereafter, on January 4, 2008, long after the deadline set in

12 the Order, without seeking any extension from counsel or the Court, Illinois

13 Union finally produced one and only one case file.  On April 30, 2008, Magistrate

14 Judge Woehrle took the Motion for Sanctions under submission.

15         Magistrate Woehrle's ruling may well provide evidentiary sanctions or the

16 opportunity to develop further evidence of Illinois Union's bad faith with respect

17 to its representation in its reservation of rights letter that it actually paid any

18 attorneys to defend a similar action in the community where the underlying claim

19 arose or is being defended.

20
          **D.      The Plaintiff Insureds Have Incurred Recoverable Damages as a**
21
                  **Result of Illinois Union's Bad Faith.**
22
          Illinois Union's assertion that it supposedly can evade the consequences of
23
    its own bad faith payment delays and refusals to pay simply because the insured
24
    has made personal arrangement with a third party to temporarily advance the
25
    funds needed to pay for the very substantial extra fees and costs that the insurer's
26
    misconduct forced the insured to incur is obviously baseless.  Illinois Union's
27
    case authority for this argument, *Waters v. United Services Auto. Ass'n,*
28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

21

41 Cal.App.4th 1063, 1081 (1996), does not support it. *Waters* merely holds that where an insured presents absolutely no proof that he incurred any attorneys fees or costs obligation, or incurred or suffered any other financial obligation, as a result of the insurer's misconduct, there is no right to recover bad faith damages. The court even noted that had the insured merely put into evidence that he actually was charged for attorneys fees to pursue his insurance claims, he would have been entitled to bad faith damages. 41 Cal.App.4th at 1081, fn. 15.

Here, the Ellis Dec., at ¶ 15, establishes that the Plaintiff Insureds have incurred over $300,000 in fees and costs to obtain the benefits to which they are entitled. The fact that the Plaintiff Insureds may have made personal arrangements with a third party to advance on an interim basis the funds necessary to pay these fees and costs does not eliminate the existence of these losses caused by the insurer and the Plaintiff Insureds' right to recover bad faith tort damages.

## IV.
## MORE THAN AMPLE TRIABLE FACTS SUPPORT THE PUNITIVE DAMAGE CLAIMS

Illinois Union makes the baseless assertion that punitive damages should not be award because Glavas' bad faith acts were not committed with managerial authority or ratified by Illinois Union. Both aspects of this assertions are false.

The Glavas deposition proves that he had managerial authority to carry out all of the acts that constitute bad faith. He appeared at the deposition designated by Illinois Union as the person most knowledgeable about Illinois Union's handling of the claim and virtually every conceivably relevant activity related thereto. (Amended Notice of Deposition of Illinois Union Insurance Company Pursuant to FRCP 30(b)(6), Exhibit L to Ellis Dec.; Glavas Dep., 117:19-118:25, Ellis Dec., Exhibit G) In that capacity, Glavas admitted that Illinois Union gave him full managerial authority to make all dispositive coverage decisions, without

GALAMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

22

1    any involvement by any other Illinois Union representative. (Glavas Dep., 33:7-

2    24, Ellis Dec., Exhibit G.)

3       Glavas also had full authority to handle all aspects of Illinois Union's

4    defense counsel payment obligations, again without any involvement by any other

5    Illinois Union representative. (Glavas Dep., 259:20-260:9, Ellis Dec., Exhibit G.)

6       In addition, Illinois Union ratified all bad faith acts by Glavas by its failure

7    to remedy the wrongful actions Glavas took even after Illinois Union's counsel

8    received letter after letter from Plaintiff Insureds' counsel expressly demanding

9    that Illinois Union's management be notified of those acts and the damages they

10    continued to cause. (See, for example, September 6, 2007 and February 5, 2008

11    letters to Illinois Union's counsel, Exhibits E and I to Ellis Dec.)

12       Illinois Union's assertion that the evidence of its bad faith is insufficient to

13    establish "oppression, fraud or malice" or "conscious disregard" of rights required

14    to state a punitive damage claim is equally baseless. The evidence shows that

15    Illinois Union consciously and deliberately frustrated one of the basic purposes

16    for obtaining insurance – reliance on the insurer's financial resources to defend

17    and protect the insured from liability suits – by (1) repeatedly ignoring request

18    after request for defense counsel payment; (2) refusing for seven months to

19    comply with its own express promise to pay a specified amount for several of the

20    past due invoices; (3) unilaterally deciding not to pay because defense counsel

21    had not yet threatened to withdraw due to non-payment; and (4) refusing yet

22    again to make timely payments immediately after promising that no further

23    payment delays would occur. On top of that, it unreasonably delayed providing

24    its initial duty to defend position and knowingly misrepresented its payment

25    practices on other alleged similar actions. Under any standard of proof, such

26    misconduct is enough to support of finding of "oppression, fraud or malice" in

27

28

GAIMS, WEIL, WEST & EPSTEIN, LLP
ATTORNEYS AT LAW
1875 CENTURY PARK EAST, 12th FLOOR, LOS ANGELES, CALIFORNIA 90067-2513
TELEPHONE (310) 407-4500

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ILLINOIS UNION INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT, ET AL.

1 | conscious disregard of the rights of the Plaintiff Insureds, entitling them to take
2 | the punitive damage claim to trial.

### V.
### CONCLUSION

For the foregoing reasons, the Plaintiff Insureds request that the Court deny Illinois Union's motion for summary judgment in its entirety.

Dated:  May 27, 2008            GAIMS, WEIL, WEST & EPSTEIN, LLP
                                MARC EPSTEIN
                                JEFFREY B. ELLIS


                                By:_____
                                    JEFFREY B. ELLIS
                                    *Attorneys for Plaintiffs S&S Development*
                                    *Company and Jeffrey Susa*

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ILLINOIS UNION INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT, ET AL.